**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTOPHER ASIS, FOWIZYYAH GOINGS, JACKIE RAY, JOSEPH TOTTEN and STEPHANIE VARGASON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF ROCHESTER, THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ROCHESTER, THE RETIREMENT PLAN COMMITTEE OF THE UNIVERSITY OF ROCHESTER RETIREMENT PROGRAM, and JOHN DOES 1-20,<br><br>Defendants. | **CIVIL ACTION NO.: 6:25-cv-06365-MAV** |

**CLASS ACTION COMPLAINT**[1]

Plaintiffs, Christopher Asis, Fowizyyah Goings, Jackie Ray, Joseph Totten and Stephanie Vargason ("Plaintiffs"), by and through their attorneys, on behalf of the University of Rochester Retirement Program (the "Plan"),[2] themselves and all others similarly situated, state and allege as follows:

## I. INTRODUCTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include the University of Rochester ("Rochester" or the "University"),

---

[1] Plaintiffs file this Amended Complaint pursuant to FED. R. CIV. P. 15(a)(1)(B).

[2] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

the Board of Trustees of the University of Rochester (the "Board") and its members during the Class Period[3] ("Board") and the Retirement Plan Committee of the University of Rochester Retirement Program and its members during the Class Period ("Committee") (collectively, the University, the Board, and the Committee, are referred to as the "Defendants") for breaches of their fiduciary duties.

2. To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F. 2d 263, 272 n.8 (2d Cir. 1982); *see also Severstal Wheeling v. WPN Corporation*, 659 F.Appx. 24 (2nd Cir. 2016).

3. The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers," including providers of the Plan's administrative and recordkeeping ("RKA") services.[4]

4. With regard to plan fees, the DOL states "You should know that your employer also must consider the fees and expenses paid by your plan."[5]

---

[3] As will be discussed in more detail below, the Class Period, is defined as July 9, 2019 through the date of judgment ("Class Period").

[4] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

[5] *Id*.

5. Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6. At all times during the Class Period, the Plan had over five billion dollars in assets under management. At the start of the Class Period in 2019, the Plan had $5,156,225,436 in assets under management. *See* 2019 Form 5500 for the Plan, Schedule H at 2. By 2023, the Plan had $7,214,339,559 in assets under management. *See* 2023 Form 5500 for the Plan, Schedule H at 2.

7. The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. In 2021, only 0.2 percent (1,011 of 641,747) of plans in the country had more than $1 billion in assets under management.[6] In addition, this was true at the start of the Class Period in 2019 where only 0.1 percent (776 of 603,217) of 401(k) plans in the country were as large as the Plan.[7]

8. As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.

9. The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 37,850 participants. *See* 2019 Form 5500 for the Plan, at 2. By 2023, the Plan had 41,821 participants. *See* 2023 Form 5500 for the Plan, at 2.

10. For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by

---

[6] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2021 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

[7] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

retirement plans, in 2020, there were only 90 defined contribution plans (401k, 401a, and 403b) in the country with between 30,000 and 39,000 participants with account balances. Additionally, there were only 54 retirement plans with between 40,000 and 49,999 participants.

11. Defendants caused the Plan to enter into an arrangement with Teachers Insurance and Annuity Association ("TIAA"), a party in interest, under which TIAA received millions of dollars in exchange for recordkeeping services rendered to the Plan. Defendants' conduct was especially egregious given that TIAA received additional income from certain of the Plan's investment securities. This arrangement with TIAA is a prohibited transaction because it "amounts to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

12. During the putative Class Period, Defendants, as the "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiffs, and to the other participants of the Plan by engaging in prohibited transactions in violation of 29 U.S.C. § 1106 (a)(1)(C).

13. Defendants' actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14. Based on this conduct, Plaintiffs assert claims against Defendants for violation of ERISA's prohibited transactions (Count I).

## II. JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

16. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Rochester does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III. PARTIES

### Plaintiffs

18. Plaintiff, Christopher Asis ("Asis"), resides in Hamlin, New York. During his employment, Plaintiff Asis participated in the Plan paying fees associated with his Plan account. Plaintiff Asis suffered injury to his Plan account by paying excessive RKA costs.

19. Plaintiff, Fowizyyah Goings ("Goings"), resides in College Park, GA. During her employment, Plaintiff Goings participated in the Plan paying fees associated with her Plan account. Plaintiff Goings suffered injury to her Plan account by paying excessive RKA costs.

20. Plaintiff, Jackie Ray ("Ray"), resides in Fairport, New York. During her employment, Plaintiff Ray participated in the Plan paying fees associated with her Plan account. Plaintiff Ray suffered injury to her Plan account by paying excessive RKA costs.

21. Plaintiff, Joseph Totten ("Totten"), resides in Plattsburgh, New York. During his employment, Plaintiff Totten participated in the Plan paying fees associated with his Plan account. Plaintiff Totten suffered injury to his Plan account by paying excessive RKA costs.

22. Plaintiff, Stephanie Vargason ("Vargason"), resides in Fairport, New York. During her employment, Plaintiff Vargason participated in the Plan paying fees associated with her Plan account. Plaintiff Vargason suffered injury to her Plan account by paying excessive RKA costs.

23. Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

24. Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**University Defendant**

25. University of Rochester is the sponsor of the Plan and a named fiduciary, with a principal place of business at 60 Corporate Woods, Rochester, New York. Rochester is a research university located in western New York, whose community includes more than 1,000 faculty, 11,000 students, and 30,000 staff.[8]

26. Rochester appointed the Committee to, among other things, administer the Plan. *See* Independent Auditor's Report ("Auditor's Report"), attached to 2023 Form 5500 for the Plan, at 3 ("The Plan is administered by the Retirement Plan Committee appointed by the Board of Trustees of the University."). As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

27. Accordingly, Rochester during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

[8] *See* https://www.rochester.edu/about/ last accessed on June 6, 2025.

28. For the foregoing reasons, the University is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

29. As indicated above, Rochester, acting through its Board of Trustees, appointed the Committee to, among other things, administer the Plan. *See also* University of Rochester Retirement Plan Committee Charter for the University of Rochester Retirement Program ("Committee Charter"), at 1 ("The Board of Trustees of the University of Rochester or its Executive Committee can change the composition of the Committee by resolution."). Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

30. Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

31. The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

32. As discussed above, Rochester and the Board appointed the Committee to, among other things, administer the Plan. *See also* Committee Charter, at 1 ("The Retirement Plan Committee (the "Committee") serves as the plan administrator and named fiduciary of the University of Rochester Retirement Program (the "Plan"). As such, the Committee is responsible for overseeing the operation and management of the Plan.").

33. "The Committee is responsible for administering the Plan in accordance with its terms and applicable legal requirements. The responsibilities and powers of the Committee include those set forth in the Plan, as well as the following:

- The Committee is responsible for overseeing the administration of the Plan.

- The Committee has full discretionary authority to interpret and construe the Plan, and to decide all issues and disputes arising under it.

- The Committee has the authority to establish such rules and procedures that it deems necessary or appropriate to administer the Plan.

- The Committee has the authority to employ attorneys, investment advisors, record-keepers, custodians, accountants, consultants and other service providers as it finds necessary or appropriate to assist it in carrying out its duties.

- The Committee has the authority to adopt an investment policy relating to Plan investments, as well as revise such policy as it deems appropriate.

- The Committee is responsible for determining the number and type of investment options available under the Plan, and selecting and monitoring the investment options available under the Plan (excluding investment options offered through a brokerage window or similar vehicle or individual annuity contracts).

- The Committee has the right to adopt any amendment to the Plan that it deems necessary or appropriate to ensure the Plan satisfies the requirements of ERISA, the Internal Revenue Code and the applicable regulations issued thereunder; to make administrative changes to the Plan; and to revise the Plan to respond to legislative or regulatory changes applicable to the Plan.

- The Committee is responsible for monitoring participant education."

Committee Charter, at 2.

34. The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

35. The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

## IV. CLASS ACTION ALLEGATIONS[9]

36. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[10]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the University of Rochester Retirement Program, at any time between July 9, 2019 through the date of judgment (the "Class Period").

37. The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 41,821 Plan "participants with account balances as of the end of the plan year." 2023 Form 5500 at 2.

38. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members

---

[9] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[10] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

39. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

- Whether Defendants are/were fiduciaries of the Plan;
- Whether Defendants committed prohibited transactions under ERISA;
- The proper form of equitable and injunctive relief; and
- The proper measure of monetary relief.

40. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

41. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

42. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby

making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V. THE PLAN

43. Rochester established the Plan "to help you meet your retirement goals." "University of Rochester 2024 Retirement Program Guide ("SPD"), at 1. As will be discussed below, the Plan has been hindered in fulfilling its purpose by the fiduciary breaches of the Defendants.

44. The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. *See* Adoption Agreement #001 ERISA 403(b) Volume Submitter Plan ("Plan Doc."), at 5 ("Defined Contribution Plan means a retirement plan which provides for an individual account for each Participant and for benefits based solely on the amount contributed to the Participant's Account, and on any Earnings, expenses, and forfeitures which the Plan may allocate to such Participant's Account."); *see also* SPD, at 23 ("The University of Rochester Retirement Program is a defined contribution plan established pursuant to Internal Revenue Code Section 403(b)."); Auditor's Report, attached to 2023 Form 5500, at 3 ("The Plan is a defined contribution plan available to employees of the University of Rochester (the University) who meet certain eligibility requirements.").

***Eligibility***

45. Employees are typically eligible to participate in the Plan after they are hired. *See* SPD, at 2 ("As an employee of the University, you may elect to make Voluntary Contributions as soon as you are hired."); *see also* Auditor's Report, attached to 2023 Form 5500, at 3 ("All employees (except students whose employment is incidental to their education at the University)

are eligible to participate in the Plan. Eligible employees are able to begin voluntary deferment as soon as administratively practicable upon employment.").

46. Unless an employee opts out of the automatic enrollment feature of the Plan, an employee will automatically be enrolled in the Plan. *See* SPD at 2 ("Newly hired or rehired, regular full-time and regular part-time employees will automatically be enrolled to make Voluntary Contributions. Automatic contributions will be made from your pre-tax eligible compensation each pay period at 3%. Your salary deferral election will increase 1% annually on the anniversary of your hire date to a maximum of 15%.").

***Contributions***

47. "Active participants may make voluntary pre-tax or Roth after-tax contributions in the form of salary reductions up to a maximum contribution of the lesser of 100% of the participant's total includible compensation for the Plan year or the maximum amount permitted by Section 415(d) of the Internal Revenue Code." Auditor's Report, attached to 2023 Form 5500, at 3; see also

48. The Plan also provides for employer matching contributions. *See* SPD, at 2 ("If you are a regular full-time or regular part -time employee, the University will make a Direct Contribution on your behalf after two years of service. The University's Direct Contribution and the earnings on that Contribution accumulate on a tax-deferred basis until you take a distribution.").

49. Like other companies that sponsor 403(b) plans for their employees, Rochester enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 403(b) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/irc-403b-tax-sheltered-annuity-

plans#:~:text=A%20403(b)%20plan%20(tax%2Dsheltered%20annuity%20plan,their%20salary%20into%20individual%20accounts..

50. Rochester also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

51. Given the size of the Plan, Rochester likely enjoyed significant tax and cost savings from offering a match.

## VI. DEFENDANTS COMMITTED A PROHIBITED TRANSACTION RESULTING IN EXCESSIVE RKA COSTS FOR THE PLAN AND ITS PARTICIPANTS

52. During the Class Period, Defendants entered into a contract with TIAA to provide RKA services to the Plan. However, such an engagement is a prohibited transaction under ERISA.

53. 29 U.S.C. §§ 1106(a)(1)(C) provides that "(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party in interest."

54. Here, TIAA was a party in interest to the Plan as it was receiving compensation for RKA services, as well as indirect compensation from the Plan in the form of revenue share being paid to TIAA from TIAA funds in the Plan.

55. The Notes to the Financial Statements attached to the Auditor's Report in the Form 5500s filed during the Class Period state specifically that TIAA was a party in-interest:

> TIAA and CREF are the insurance companies of the Plan and TIAA is the recordkeeper of the Plan's assets. TIAA, FSB is the directed custodian of certain assets of the Plan recordkept by TIAA. Therefore, transactions between TIAA, CREF, TIAA, FSB, and the Plan qualify as party in-interest transactions. Additionally, notes receivable from participants and plan loans qualify as party-in-interest transactions.

*See,* 2021 Form 5500, Auditor's Report, Notes to Financial Statements at 11.

### 1. Costs for Recordkeeping Services Vary Little Between Competing Providers for a Plan with a Substantial Number of Participants

56. The term “recordkeeping” is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's “recordkeeper.” Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

57. There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a “bundled” fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an “all-you-can-eat” basis), including, but not limited to, the following services:

A. Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B. Multi-channel participant and plan sponsor access (e.g. phone, web);

C. Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D. Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E. Participant tax reporting services (e.g., IRS Form 1099-R);

F. Participant confirmations, statements, and standard notices;

G. Plan-level reporting and annual financial package (excluding IRS Form 5500);

H. Participant education (e.g. newsletters, web articles, standard communication materials);

I. Plan consulting (e.g., preapproved document services, operational materials);

J. Plan consulting (e.g. preapproved document services, operational compliance support).

58. This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

59. The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

a. Loan processing;

b. Brokerage services/account maintenance (if offered by the plan);

c. Distribution services; and

d. Processing of qualified domestic relations orders.

60. All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

61. The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study,[11] at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[12]

62. In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant.***

63. Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Empower, TIAA, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services).

[11] https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("1998 DOL Study").

[12] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/.

64. Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

**2. The Plan's Recordkeeping Fees were Excessive**

65. Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

66. As demonstrated in the charts below, the Plan's participants were saddled with above-market administrative and recordkeeping fees throughout the Class Period.

67. The Plan's per participant RKA fees were as follows:

| Plan Year | Participants | Total RKA Reported | $PP |
|---|---|---|---|
| 2019 | 37,850 | $1,863,908 | $49.24 |
| 2020 | 38,820 | $1,863,269 | $48.00 |
| 2021 | 40,268 | $1,656,915 | $41.15 |
| 2022 | 42,413 | $1,298,520 | $30.62 |
| 2023 | 41,821 | $1,294,106 | $30.94 |

68. Looking at recordkeeping costs for plans similar in size to the combined assets and participant size of the Plan during the Class Period shows that the Plan was paying higher recordkeeping fees than its peers.

| Recordkeeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Indirect Compensation | Cost Per Participant[13] |
|---|---|---|---|---|---|---|---|
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2019 | $5,675,354,000 | 42,339 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $9 |

[13] Unless otherwise noted, these fees are taken from the Form 5500.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Great-West Life | Deseret 401(k) Plan | 2019 | $4,264,113,298 | 34,938 | 64 | Yes - $0 | $22 |
| Fidelity | The Dow Chemical Company Employees' Savings Plan | 2019 | $10,913,979,302 | 37,868 | 37 50 64 60 65 | Yes - $0 | $25 |
| Vanguard/ Prudential | Philips North America 401(k) Plan | 2019 | $4,898,009,752 | 28,428 | 15 37 50 65 99 | Yes - $0 | $25 |
| **TIAA** | **The Rochester Plan** | **2019** | **$5,156,225,436** | **37,850** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$49** |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2020 | $1,051,387,744 | 19,354 | 15, 25, 50, 16, 26, 52, 21, 37, 57 | Yes - $0 | $23 |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2020 | $6,618,601,000 | 43,691 | 15 21 25 28 37 38 49 50 52 59 62 64 65 99 | Yes - $0 | $25 |
| Prudential | Philips North America 401(k) Plan | 2020 | $5,663,746,665 | 28,348 | 15 37 50 65 99 | Yes - $0 | $25 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2020 | $5,564,538,096 | 67,149 | 37 60 64 65 | Yes - $0 | $26 |
| **TIAA** | **The Rochester Plan** | **2020** | **$6,445,033,629** | **38,820** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$48** |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2021 | $7,716,713,000 | 51,276 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $13 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2021 | $6,372,464,202 | 66,814 | 37 60 64 65 71 | Yes - $0 | $25 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Prudential | Philips North America 401(k) Plan | 2021 | $6,384,324,582 | 30,245 | 15 37 50 65 99 | Yes - $0 | $25 |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2021 | $1,706,447,554 | 15,788 | 37, 60, 64, 65, 71 | Yes - $0 | $26 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2021 | $1,341,037,601 | 10,170 | 37, 60, 64, 65, 71 | Yes - $0 | $28 |
| **TIAA** | **The Rochester Plan** | **2021** | **$5,661,846,887** | **40,268** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$41** |
| | | | | | | | |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2022 | $6,601,217,000 | 55,419 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $13 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2022 | $5,870,072,827 | 43,386 | 37 64 65 71 | Yes - $0 | $22 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2022 | $5,315,577,972 | 67,449 | 37 60 64 65 71 | Yes - $0 | $25 |
| Prudential | Philips North America 401(k) Plan | 2022 | $5,180,251,859 | 30,811 | 15 37 50 65 99 | Yes - $0 | $26 |
| **TIAA** | **The Rochester Plan** | **2022** | **$6,362,782,969** | **42,413** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$31** |
| | | | | | | | |
| Fidelity | The Dow Chemical Company Employees' Savings Plan | 2023 | $10,073,680,220 | 33,196 | 37 50 64 60 65 16 | Yes - $0 | $9 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2023 | $7,509,872,000 | 55,419 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $18 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2023 | $5,808,822,663 | 37,647 | 37 64 65 71 | Yes - $0 | $20 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2023 | $6,529,632,096 | 71,322 | 37 60 64 65 71 | Yes - $0 | $24 |
| Prudential | Philips North America 401(k) Plan | 2023 | $5,779,286,156 | 29,489 | 15 37 50 65 99 | Yes - $0 | $27 |
| T. Rowe Price | Sanofi U.S. Group Savings Plan | 2023 | $7,800,386,450 | 26,698 | 15 37 49 | Yes - $0 | $27 |
| **TIAA** | **The Rochester Plan** | **2022** | **$7,214,339,559** | **41,821** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$31** |

69. The above chart demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees over the course of the Class Period.

70. As of the end of 2021 there were only 1,011 (0.2%) 401(k) plans with more than $1 billion in plan assets. *See* https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf. The Plan's $40 per participant average fee from 2019 to 2023 is 45% greater than the average fee of $22 per participant from 2019 to 2023 for the twenty-three (23) plans listed above.

71. This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years from 2019 through at least 2023. Indeed, the figures in the above chart are just an example of the Plan's excessive RKA fees from 2019 through 2023.

72. The Plan should have been able to obtain per participant recordkeeping fees of no more than $22 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

73. Further, because TIAA was a party-in-interest and received income from the funds it maintained in the Plan, the Plan's fiduciaries should have taken these additional sources of income into consideration to reduce the excessive RKA fees paid to TIAA.

74. Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

## COUNT I

### Prohibited Transactions (Against All Defendants)

75. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

76. ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

77. ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

78. ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

79. Defendants' decision to agree to pay excessive fees to TIAA as recordkeeper for the Plan amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

80. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D. An order requiring the University Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the University Defendant as necessary

to effectuate said relief, and to prevent the University Defendant's unjust enrichment;

E. Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

G. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

H. An award of pre-judgment interest;

I. An award of costs pursuant to 29 U.S.C. § 1132(g);

J. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

K. Such other and further relief as the Court deems equitable and just.

Dated: November 10, 2025

Respectfully submitted,

*<u>/s/ Mark K. Gyandoh</u>*
Mark K. Gyandoh, Esquire
PA Attorney ID #88587
**CAPOZZI ADLER, P.C.**
James A. Maro, Esquire
PA Attorney ID #86420
(*Admissions Pro Hac Vice to be Requested)*
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200
Facsimile: (717) 233-4103
Email: markg@capozziadler.com
jamesm@capozziadler.com

Elizabeth A. Cordello, Esquire
New York Bar #4148284
**PULLANO & FARROW**
401 Main Street
East Rochester, NY 14445
Telephone: (585) 730-4773
Facsimile: (888) 971-3736
Email: ecordello@lawpf.com

*Counsel for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2025, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By: */s/Mark K. Gyandoh*
Mark K. Gyandoh, Esq.