**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

CHRISTOPHER ASIS, FOWIZYYAH GOINGS, JACKIE RAY, JOSEPH TOTTEN and STEPHANIE VARGASON, individually and on behalf of others similarly situated,

*Plaintiffs*,

v.

UNIVERSITY OF ROCHESTER, THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ROCHESTER, THE RETIREMENT PLAN COMMITTEE OF THE UNIVERSITY OF ROCHESTER RETIREMENT PROGRAM, and JOHN DOES 1-20,

*Defendants*.

Civil Action No. 6:25-cv-06365-MAV

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law, and all other papers and prior proceedings had herein, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants University of Rochester, the Board of Trustees of the University of Rochester, and the Retirement Plan Committee of the University of Rochester Retirement Program, by and through their counsel, hereby move this Court to dismiss Plaintiffs' Amended Complaint (Dkt. No. 12, "Am. Compl."). As set out in detail in the accompanying memorandum of law, Plaintiffs' allegations in the Amended Complaint fail to demonstrate a requisite injury to sustain their Prohibited Transactions claim and fail to state a claim for which relief can be granted pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA").

PLEASE TAKE FURTHER NOTICE that, pursuant to Local Rule 7(a)(1), Defendants intend to file and serve a reply no later than seven days after opposition papers are filed.

Dated: December 15, 2025

**MAYER BROWN LLP**

*/s/ Nancy G. Ross*
Nancy G. Ross
Richard E. Nowak (*pro hac vice pending*)
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, IL 60606
Phone: (312) 782-0600
Email: nross@mayerbrown.com
rnowak@mayerbrown.com

E. Brantley Webb (*pro hac vice*)
Jennifer L. Weinberg (*pro hac vice*)
MAYER BROWN LLP
1999 K St. NW
Washington, DC 20006
Phone: (202).263-3000
Email: bwebb@mayerbrown.com
jlweinberg@mayerbrown.com

# TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

A. The Plan ..... 2

B. The Plan's Recordkeeping and Administrative Services ..... 2

LEGAL STANDARDS ..... 3

ARGUMENT ..... 5

I. Plaintiffs Lack Article III Standing ..... 6

A. Plaintiffs' Allegations Fail to Establish An Injury-In-Fact By Virtue of Merely Asserting a Prohibited Transactions Claim. ..... 6

B. Plaintiffs Fail To Allege Injury From What They Concede Are "Essential" Services. ..... 7

C. Plaintiffs Fail to Allege Injury From the Fees Paid to TIAA for its Essential Services ..... 8

1. Plaintiffs do not allege harm from the mechanism for paying the Plan's recordkeeping fees. ..... 9

2. Plaintiffs do not allege harm from the amount of the Plan's recordkeeping fees. ..... 9

i. The Amended Complaint does not allege what the supposed comparators paid for their recordkeeping services. ..... 10

ii. The Amended Complaint does not allege what the Plan paid TIAA for recordkeeping services. ..... 13

II. Plaintiffs Fail to Plausibly Allege a Prohibited Transaction Under Rule 12(b)(6). ..... 14

A. Plaintiffs' Conclusory Allegations Are Insufficient to State a Claim. ..... 14

B. Plaintiffs' Establish The ERISA Section 408(b)(2) Exemption On The Face Of The Amended Complaint. ..... 15

III. The University of Rochester, the Board of Trustees, and the Unnamed Board Members Are Not Proper Defendants. ..... 17

CONCLUSION ..... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Life Ins. Co. v. Fast Lab Techs., LLC*,
2025 WL 2463706 (S.D.N.Y. Aug. 27, 2025) ........ 15, 16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 4, 14

*In re Beacon Assocs. Litig.*,
745 F. Supp. 2d 386 (S.D.N.Y. 2010) ........ 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 4, 14

*Boyette v. Montefiore Med. Ctr.*,
2025 WL 48108 (2d Cir. Jan. 8, 2025) ........ 9

*Busha v. S.C. Dep't of Mental Health*,
2019 WL 653969 (D.S.C. Jan. 28, 2019), *report adopted sub nom.* 2019 WL 651680 (D.S.C. Feb. 13, 2019) ........ 15

*Collins v. Ne. Grocery, Inc.*,
2025 WL 2383710 (2d Cir. Aug. 18, 2025) ........ 9, 12

*Cunningham v. Cornell University*,
604 U.S. 693 (2025) ........ 1, 4, 5, 6, 14, 15

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014) ........ 5

*Fleming v. Kellogg Co.*,
No. 1:22-cv-0593, (W.D. Mich., Dec. 8, 2025) ........ 14

*Gonzalez v. Northwell Health, Inc.*,
632 F. Supp. 3d 148 (E.D.N.Y. 2022) ........ 9

*Hill v. Delaware N. Companies Sportservice, Inc.*,
2012 WL 2405233 (W.D.N.Y. June 25, 2012) ........ 15, 16

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996) ........ 7

*Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*,
541 F. Supp. 3d 496 (D.N.J. 2021) ........ 14

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................3, 6

*MacTaggert on behalf of Extreme Eng'g Sols., Inc. Emp. Stock Ownership Plan v. Pro. Fiduciary Servs., LLC*, 2025 WL 1726143 (W.D. Wis. June 20, 2025)....................6, 7, 8

*Markel Am. Ins. Co. v. Mr. Demolition, Inc.*,
717 F. Supp. 3d 238 (E.D.N.Y. 2024)....................15

*Mator v. Wesco Dist., Inc.*,
102 F.4th 172 (3d Cir. 2024)....................12

*Pani v. Empire Blue Cross Blue Shield*,
152 F.3d 67 (2d Cir. 1998)....................15

*Pizarro v. Home Depot, Inc.*,
634 F. Supp. 3d 1260 (N.D. Ga. 2022), *aff'd*, 111 F.4th 1165 (11th Cir. 2024), *petition for cert. filed*, No. 24-620 (U.S. Dec. 6, 2024)....................7

*Reich v. Compton*,
57 F.3d 270 (3d Cir. 1995)....................14

*Rose v. Guardian Life Ins. Co. of Am.*,
2025 WL 2972236 (D.S.C. Oct. 21, 2025)....................15

*Rosenkranz v. Altru Health Sys.*,
2021 WL 5868960 (D.N.D. Dec. 10, 2021)....................8

*Santiago v. Univ. of Miami*,
2021 WL 1173164 (S.D. Fla. Mar. 1, 2021), *report and recommendation adopted*, 2021 WL 1165441 (S.D. Fla. Mar. 26, 2021)....................7

*Singh v. Deloitte LLP*,
123 F.4th 88 (2d Cir. 2024)....................4, 9

*Spokeo Inc. v. Robins*,
578 U.S. 330 (2016)....................3, 4

*Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013)....................5

*Thole v. U.S. Bank N.A.*,
590 U.S. 538 (2020)....................4, 5, 6

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................4

**Statutes**

ERISA § 3(14), 29 U.S.C. § 1002(14) ........................................................................5

ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1) ..............................................................5, 15

ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2)..............................................................5, 15, 16, 17

**Other Authorities**

U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 3 (Sept. 2019)........................................2, 3, 10

U.S. Dep't of Labor, *Tips for Selecting and Monitoring Service Providers for Your Employee Benefit Plan* 1, https://perma.cc/KT2P-ZP3H (last visited Oct. 20, 2025) ........................................................................................................3

## INTRODUCTION

Plaintiffs' Amended Complaint highlights the "serious" concern expressly acknowledged by the Supreme Court in *Cunningham v. Cornell University*: that ERISA plaintiffs could engage in an "avalanche of meritless litigation" and "too easily get past the motion-to-dismiss stage and subject defendants to costly and time-intensive discovery." 604 U.S. 693, 707-08 (2025). By amending their Complaint in response to Defendants' motion to dismiss and abandoning their breach of fiduciary duty claims, Plaintiffs concede that their challenge to the Plan's recordkeeping fees was meritless and reveal their true motivation in bringing this lawsuit.

The substantive allegations in the Amended Complaint mirror those in the initial Complaint. *Compare* Dkt. 1 ¶¶ 18-73 *with* Dkt. 12 ("Am. Compl.") ¶¶ 18-74. The key difference is that Plaintiffs have jettisoned their excessive fee fiduciary breach claims in favor of a single prohibited transaction claim under ERISA Section 406(a)(1) because they hope to take advantage of *Cunningham* to survive a motion to dismiss. Plaintiffs allege that Defendants committed a prohibited transaction because the Plan purportedly paid "excessive" recordkeeping fees—even though they have acknowledged that their excessive recordkeeping fee claim cannot stand.

The Amended Complaint cannot proceed. While Plaintiffs are plainly attempting to exploit *Cunningham* and strong-arm Defendants into costly and burdensome discovery, Plaintiffs' allegations run contrary to well-established pleading standards. The Amended Complaint fails to plausibly allege an injury sufficient to establish Article III standing and also fails to state a plausible prohibited transaction claim. For these reasons, the Amended Complaint should be dismissed with prejudice.

## BACKGROUND

### A. The Plan

The Plan is a defined contribution plan that provides each participant with an individual account. Am. Compl. ¶ 44. The participant's account value is based on the amount each participant contributes as adjusted by any income, expense, gains and losses, and any forfeitures allocated to the participant's account. *Id.* Employee participants are automatically enrolled in the Plan unless they opt out, and the University of Rochester makes matching direct contributions to the participants' accounts. *Id*. ¶¶ 46, 48. Throughout the Class Period, the Plan had between 37,850 and 41,821 participants and between $5.1 billion and $7.2 billion in assets. *Id.* ¶¶ 6, 9. The Plan is sponsored by the University of Rochester and administered by the Retirement Plan Committee of the University of Rochester Retirement Program ("Committee"). *Id.* ¶¶ 25-26.

### B. The Plan's Recordkeeping and Administrative Services

Defined contribution plan fiduciaries routinely retain third-party service providers to help administer their plans and provide specialized plan services. As the US Department of Labor ("DOL") has recognized, plans utilize a wide variety of third-party services, from "recordkeeping, accounting, legal, and trustee services" to "educational seminars, retirement planning software, investment advice," among other things.[1] A plan sponsor, like the University of Rochester, contracts with one or more third-parties to provide these services—for example, a CPA for accounting, a law firm for legal advice, and here, TIAA for recordkeeping, administrative, and other services.

Like with any other service provider, recordkeepers are compensated for the necessary recordkeeping and administrative services they provide to retirement plans. As the DOL

[1] U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 3, (Sept. 2019), https://perma.cc/9BP8-YRGR.

recognizes, fees and expenses are just one of several factors for plan fiduciaries to consider when evaluating their recordkeepers and the DOL has emphasized that "plan fiduciaries are not always required to pick the least costly provider."[2] In fact, the DOL has also recognized that "generally the more services provided, the higher the fees."[3]

Plaintiffs allege that "[t]he term 'recordkeeping' is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's 'recordkeeper.'" Am. Compl. ¶ 56. Plaintiffs allege that plan recordkeepers offer the following categories of recordkeeping and administrative services, which Plaintiffs describe as "essential": a) basic account recordkeeping, b) multi-channel participant and plan sponsor access, such as phone support and web access, c) daily participant transaction accounting, d) payroll service, e) participant tax reporting services, f) participant confirmations, statements, and standard notices, g) plan-level reporting and annual financial package, h) participant education, and i) plan consulting. *Id.* ¶ 57. Plaintiffs do not allege how each category of services differs from recordkeeper to recordkeeper, nor do they address any qualitative differences in those services.

Plaintiffs also allege that recordkeepers offer plans additional "a la carte" services such as a) loan processing, b) brokerage services/account maintenance, c) distribution services, and d) handling of qualified domestic relations orders. *Id.* ¶ 59. Plaintiffs do not allege how these categories of "a la carte" services—or their pricing—differ from recordkeeper to recordkeeper.

## LEGAL STANDARDS

"[P]laintiff[s], as the part[ies] invoking federal jurisdiction, bear the burden of establishing" Article III standing. *Spokeo Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Lujan v. Defs.*

---

[2] U.S. Dep't of Labor, *Tips for Selecting and Monitoring Service Providers for Your Employee Benefit Plan* 1, https://perma.cc/Z2V7-5SGK (last visited Dec. 12, 2025).

[3] *A Look at 401(k) Plan Fees* 3, *supra* note 1.

*of Wildlife*, 504 U.S. 555, 561 (1992). This standard fully applies to ERISA plaintiffs as "[t]here is no ERISA exception to Article III." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020). Accordingly, as the Supreme Court expressly held in *Cunningham*, district courts "must" dismiss ERISA suits that allege statutory violations "but fail to identify an injury." 604 U.S. at 708. To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(1), a plaintiff must allege facts demonstrating (1) "an injury in fact" that (2) was "likely caused by" the defendant and (3) "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). A statutory violation, without more, is insufficient to demonstrate standing. *Id.* at 426; *see also Spokeo*, 578 U.S. at 341 ("Article III standing requires a concrete injury even in the context of a statutory violation.").

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While a court analyzing a motion to dismiss must accept as true all well-pleaded factual allegations in the complaint, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (internal quotation omitted). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *Id.* at 570; *see also Singh v. Deloitte LLP*, 123 F.4th 88, 93 (2d Cir. 2024) (same). Determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Strictly enforcing the "irreducible constitutional minimum" of standing, *Spokeo*, 578 U.S. at 338, and the pleading standard of Rule 12(b)(6) are essential because motions to dismiss are an "important mechanism for weeding out meritless [ERISA] claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). Indeed, as the Second Circuit has found, "the prospect of discovery" in an ERISA class action "is ominous" and "elevates the possibility that 'a plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (alterations in original) (citation omitted).

## ARGUMENT

The Amended Complaint is exactly what the Supreme Court warned about in *Dudenhoeffer* and *Cunningham* because Plaintiffs now assert *only* a prohibited transaction claim under ERISA Section 406(a)(1), having conceded that their excessive fee recordkeeping claim cannot stand. Section 406(a)(1) provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."[4] 29 U.S.C. § 1106(a)(1). ERISA, however, provides a statutory exemption to Section 406(a)(1). ERISA Section 408(b)(2) expressly permits a plan to engage in the transactions covered by Section 406(a)(1) where the services are "necessary for plan operation and the fees are reasonable." 29 U.S.C. § 1108(b)(2).

[4] ERISA Section 3(14) defines "party-in-interest" to include, in relevant part, (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer." 29 U.S.C. § 1002(14).

## I. Plaintiffs Lack Article III Standing.

The Supreme Court has instructed that "Article III standing requires concrete injury even in the context of a statutory violation." *Thole*, 590 U.S. at 544. The Court recently expounded on this requirement in *Cunningham*, when it recognized that ERISA plaintiffs might seek to take advantage of its ruling by asserting "meritless" prohibited transaction claims. 604 U.S. at 708. The Court emphasized that, as a gatekeeping matter, "[d]istrict courts must also, consistent with Article III standing, dismiss suits that allege a prohibited transaction occurred but fail to identify an injury." *Id.* (citing *Thole*, 590 U.S. at 544). Because Plaintiffs do not, and cannot, allege that they have suffered an injury sufficient to confer Article III standing, the Amended Complaint should be dismissed.

### A. Plaintiffs' Allegations Fail to Establish An Injury-In-Fact By Virtue of Merely Asserting a Prohibited Transactions Claim.

As a threshold matter, Plaintiffs lack standing because they have not, and cannot, allege they were injured by TIAA's mere provision of recordkeeping services to the Plan. Simply alleging a prohibited transaction claim does not automatically establish an injury-in-fact sufficient for Article III standing. *Cunningham*, 604 U.S. at 708; *Lujan*, 504 U.S. at 561 (the plaintiff's burden to establish standing elements are "not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof . . ."). Plaintiffs must demonstrate injury from the alleged prohibited transaction.

The district court's recent analysis in *MacTaggert on Behalf of Extreme Eng'g Sols., Inc. Emp. Stock Ownership Plan v. Professional Fiduciary Servs., LLC* is instructive. 2025 WL 1726143, at *6 (W.D. Wis. June 20, 2025). In that case, the district court adhered to the Supreme Court's instruction in *Cunningham* and dismissed the prohibited transaction claim for lack of

standing because the "plaintiff's allegation that defendants engaged in a 'prohibited transaction' is not sufficient to infer that he suffered an actual injury for purposes of standing, but rather only that an ESOP transaction occurred." *Id*. The district court emphasized that, if ERISA's statutory prohibition on the purchase of company stock were absolute,

> it would make all ESOPs illegal, as every ESOP's purchase of stock from company officers, directors or significant shareholders is technically a 'prohibited transaction' under § 1106(a)(1)(E). As plaintiff is aware, an exception in 29 U.S.C. § 1108(e) allows a plan to buy the employer's stock "for adequate consideration," defined in 29 U.S.C. § 1002(18)(B) as the fair market value of the stock. As applicable to the standing analysis in particular, an employee ESOP participant would not suffer an injury from a 'prohibited transaction' if the employer's stock was purchased for fair market value.

*Id.*

So, too, here: if ERISA Section 406(a)(1) absolutely prohibited retaining and compensating third-party service providers to provide what Plaintiffs concede are essential and necessary recordkeeping services—or paying those recordkeepers through revenue sharing—retirement plans could not operate. *See infra* Sections I.B.–I.C. Beyond this, Plaintiffs fail to adequately allege that they suffered any injury from the mere existence of the alleged prohibited transaction.

### B. Plaintiffs Fail To Allege Injury From What They Concede Are "Essential" Services.

Far from alleging that TIAA's recordkeeping services harmed the Plan or its participants, Plaintiffs admit TIAA's recordkeeping services were "***essential***" to the Plan. Am. Compl. ¶¶ 57-59 (emphasis added). Myriad courts have also recognized that third-party recordkeeping services are necessary and essential for retirement plans. *See, e.g.*, *Pizarro v. Home Depot, Inc.*, 634 F. Supp. 3d 1260, 1272 (N.D. Ga. 2022), *aff'd*, 111 F.4th 1165 (11th Cir. 2024), *petition for cert. filed*, No. 24-620 (U.S. Dec. 6, 2024) ("It is undisputed that recordkeeping services were necessary."); *Santiago v. Univ. of Miami*, 2021 WL 1173164, at *1 (S.D. Fla. Mar. 1, 2021), *report and recommendation adopted*, 2021 WL 1165441 (S.D. Fla. Mar. 26, 2021) ("Recordkeeping is,

Plaintiffs conceded, a necessary service for this and every defined contribution plan, and recordkeeping fees incurred by the Plan are ultimately borne by the participants.").

In contrast, prohibited transaction claims under ERISA Section 406(a)(1) "generally involve uses of plan assets that are potentially harmful to the plan." *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996). There are no such allegations in the Amended Complaint. Accordingly, because Plaintiffs do not allege any cognizable injury from the fact of TIAA's provision of essential and necessary recordkeeping services to the Plan, Am. Compl. ¶¶ 57-59, they lack Article III standing to assert a prohibited transaction claim challenging those services.

Whether TIAA was a party in interest does not change this analysis. Plaintiffs allege that "TIAA was a party in interest to the Plan as it was receiving compensation for RKA services, as well as indirect compensation from the Plan in the form of revenue share being paid to TIAA from TIAA funds in the Plan." Am. Compl. ¶ 54. But even accepting Plaintiffs' conclusory allegations that TIAA was a "party of interest," and acknowledging the unremarkable fact that TIAA was paid for its provision of essential services to the Plan, Plaintiffs do not allege an injury-in-fact sufficient for Article III standing. *See, e.g.*, *MacTaggert,* 2025 WL 1726143, at *6.

### C. Plaintiffs Fail to Allege Injury From the Fees Paid to TIAA for its Essential Services.

Plaintiffs also lack Article III standing because they have not, and cannot, allege they were injured by the Plan's payment of fees to TIAA for its provision of essential and necessary recordkeeping services. The mere fact of that payment manifestly does not establish injury. Thus, Plaintiffs' prohibited transaction claim is premised on two other theories regarding TIAA's compensation. But neither of these theories alleges an injury sufficient to confer Article III standing.

1. *Plaintiffs do not allege harm from the mechanism for paying the Plan's recordkeeping fees.*

Plaintiffs base their prohibited transaction claim on the unremarkable assertion that the Plan used revenue sharing to compensate TIAA for its essential services. Am. Compl. ¶ 54. "[R]ecordkeeping fees can either be paid directly by the plan's assets, indirectly by the plan's investments (called revenue sharing), or by some combination of both." *Rosenkranz v. Altru Health Sys.*, 2021 WL 5868960, at *4 (D.N.D. Dec. 10, 2021). Plans paying their recordkeepers through revenue sharing is a common and lawful practice. As the Second Circuit recently explained, revenue sharing is a "common" form of indirect compensation that exists alongside direct payments to the recordkeeper for recordkeeping services. *Collins v. Ne. Grocery, Inc.*, 2025 WL 2383710, at *5 (2d Cir. Aug. 18, 2025) (summary order); *see also Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148, 166 (E.D.N.Y. 2022) ("plaintiff does not dispute that the fees for plans are generally paid by a combination [of] direct and indirect mechanism[s]") (alterations in original). Accordingly, simply alleging that TIAA was paid some of its compensation through revenue sharing does not establish Article III standing—just as alleging the Plan paid TIAA for recordkeeping services also fails to establish Article III standing.

2. *Plaintiffs do not allege harm from the amount of the Plan's recordkeeping fees.*

By dropping their fiduciary breach claim challenging the Plan's recordkeeping fees, Plaintiffs concede that their allegations do not meet the Rule 12(b)(6) standard for plausibility. In so doing, they also tacitly admit that they lack Article III standing to pursue their prohibited transaction claim. If Plaintiffs cannot maintain any claim premised on allegedly excessive recordkeeping fees, it necessarily follows that they do not clear the bar for Article III injury either.

Plaintiffs allege in conclusory fashion that "Defendants' decision to agree to pay excessive fees to TIAA as recordkeeper for the Plan" was a prohibited transaction. Am. Compl. ¶ 79.

However, Plaintiffs' wholly flawed allegations fail to plausibly support this conclusion and consequently, fail to establish the requisite injury for Article III standing.

In *Singh* and *Boyette*, the Second Circuit recognized that a plaintiff challenging a plan's recordkeeping fees must "plausibly [] allege that challenged fees were excessive relative to the services rendered." *Singh*, 123 F.4th at 93; *Boyette v. Montefiore Med. Ctr.*, 2025 WL 48108, at *1 (2d Cir. Jan. 8, 2025) (summary order) (plaintiffs "cannot rely on bare allegations that other plans paid less" for recordkeeping services) (internal quotation marks omitted)). The Second Circuit's rulings and its reasoning reflect the fact that recordkeepers are necessarily compensated for the recordkeeping services they provide to retirement plans and, as the DOL has explained, "generally the more services provided, the higher the fees."[5]

By dropping their fiduciary breach claims in response to Defendants' original motion to dismiss (Dkt. 10), Plaintiffs concede that their excessive recordkeeping fee allegations do not meet the standard for plausibility under Fed. R. Civ. P. 12(b)(6). But in fact, as explained in Defendants' original motion, Plaintiffs' allegations are so admittedly defective in this case that they do not, and cannot, establish an Article III injury either.

i. The Amended Complaint does not allege what the supposed comparators paid for their recordkeeping services.

Plaintiffs allege that the Plan should have been paying "no more than $22 per participant" for recordkeeping and administrative services. Am. Compl. ¶ 72. To support this arbitrary and conclusory fee allegation, Plaintiffs calculate the per-participant fees purportedly paid by several cherry-picked plans for "recordkeeping and administrative services" from 2019 to 2023. *Id.* ¶ 68. But Plaintiffs' methodology for calculating these comparator plans' fees is obviously flawed:

[5] *A Look at 401(k) Plan Fees* 3, *supra* note 1.

Plaintiffs expressly acknowledge that their comparator plans—which notably vary from year to year and vastly differ in the number of participants and assets under management—received a wide variety of services, and they concede that the plans paid *additional* fees for those services (called "indirect compensation"), but they entirely ignore those additional fees in calculating the plans' alleged per-participant fees.

*First*, the alleged comparator plans utilize from different recordkeepers a wide range of recordkeeping, administrative, and other services.[6] Am. Compl. ¶ 68. For example, in 2019, the Deseret 401(k) plan Form 5500 lists only recordkeeping fees (Code 64), while the Thermo Fisher Scientific Inc. 401(k) Retirement plan Form 5500 lists a lengthy list of additional service codes.[7] *Id.* The Thermo Fisher Scientific plan thus reported receiving a much broader variety of services from its recordkeeper than did the Deseret plan. Notably, Plaintiffs contend that the Thermo Fisher Scientific plan paid only ***$9*** for all of these services, while the Deseret plan apparently paid ***$22*** for only one service. Am. Compl. ¶ 68.

*Second,* such bewildering comparator fee allegations result from the fact that Plaintiffs completely ignore the *additional* fees their comparator plans paid for the recordkeeping,

---

[6] Plaintiffs selectively relied on the Form 5500s submitted by their comparator plans when they prepared the table in paragraph 68 of the Amended Complaint. Plan sponsors report limited information about the services their plans receive in an "Annual Return/Report of Employee Benefit Plan" filed with the DOL (known as a "Form 5500"). As part of this Form 5500, plan sponsors describe in Schedule C the specific services provided by each third-party service provider to their plan and the plan's participants using one or more of approximately 50 different "service codes." *See* **Ex. A**, Form 5500 Instructions, at 28 (identifying service codes).

[7] These codes include recordkeeping and information management (computing, tabulating, data processing, etc.) (Code 15), trustee (bank, trust company, or similar financial institution) (Code 21), trustee (directed) (Code 25), investment management (Code 28), securities brokerage (Code 33), participant loan processing (Code 37), participant communication (Code 38), other services (Code 49), direct payment from the plan (Code 50), investment management fees paid indirectly by plan (Code 52), other commissions (Code 55), shareholding servicing fees (Code 59), float revenue (Code 62), recordkeeping fees (Code 64), and account maintenance fees (Code 65). *See* Am. Compl. ¶ 68; **Ex. A**, Form 5500 Instructions, at 28 (identifying service codes).

administrative, and other services they were receiving. Plaintiffs are transparent about this—they concede that the Plan and the comparator plans *all* paid additional fees (reported on the Form 5500 as "indirect compensation"). Am. Compl. ¶ 68. However, Plaintiffs make the unreasonable—and plainly inaccurate—assumption that the plans paid $0 in indirect compensation to their recordkeepers, even though they all reported on their respective Form 5500s that their recordkeepers were paid indirect compensation. Am. Compl. ¶ 68 ("Yes-$0").[8]

Plaintiffs' allegations are as contradictory as they are illogical. "Indirect [compensation] fees are paid by participants as a result of revenue-sharing agreements between recordkeepers and plan investments, such as mutual funds." *Mator v. Wesco Dist., Inc.*, 102 F.4th 172, 179 (3d Cir. 2024) (quotations and citations omitted). This type of compensation is "common." *Collins*, 2025 WL 2383710, at *5. Taking the Amended Complaint at its word, it is nonsensical that any plan—let alone each and every plan listed in the Amended Complaint—would report that it paid indirect compensation to its recordkeeper when it did not. Rather, Plaintiffs' "indirect compensation" allegations—which plainly misstate the Form 5500s upon which they purport to rely—are a concession that the "fees" for the various recordkeeping, administrative, and other services alleged in the Amended Complaint are simply inaccurate.

Ultimately, such wholly meaningless allegations fail to meet the basic threshold for pleading Article III injury.

[8] The Form 5500 instructions do not require plans to report the amount of any eligible indirection compensation paid to their recordkeepers if they received the appropriate written disclosures describing the eligible indirection compensation. **Ex. A**, Form 5500 Instructions, at Page 28 (Elements (e), (f), (g), and (h)), Page 27 (instructions for Schedule C, Line 1); *see also* **Ex. B**, Plan's 2022 Form 5500, at PDF p. 10.

ii. The Amended Complaint does not allege what the Plan paid TIAA for recordkeeping services.

The Amended Complaint's dispositive shortcomings are further illuminated by the fact that Plaintiffs do not even attempt to allege the actual amounts the Plan paid to TIAA for its recordkeeping services. Plaintiffs allege that between 2019 and 2023, the Plan paid a decreasing amount of fees for "recordkeeping and administrative services" from $49.24 to $30.94 per participant. Am. Compl. ¶ 67. But even a cursory look at the Plan's Form 5500s reveals that the "fees" Plaintiffs identify for recordkeeping and administrative services include several additional services.

Using the Plan's Form 5500s,[9] Plaintiffs allege the Plan reported receiving myriad services from TIAA.[10] Am. Compl. ¶ 68; *see also* **Ex. B**, Plan's 2022 Form 5500, at PDF p. 10. The Amended Complaint connects *each* of these services to the per-participant recordkeeping fee the Plan was supposedly paying to TIAA. *See, e.g.*, Am. Compl. ¶ 68 (alleging TIAA was receiving $31 per Plan participant in 2022 for providing services 15, 17, 27, 28, 38, 50, 52, 54, 64, and 66 to the Plan). Notably, many of these services are not included in Plaintiffs' own definition of "recordkeeping and administrative services." *Compare* Am. Compl. ¶ 57 (A)—(J) *with* ¶ 68 (tbl.). Plaintiffs' definition of "recordkeeping and administrative services," for instance, does not include investment advisory, investment management, or insurance charges, all of which appear in the Plan's Form 5500 service codes (cited by Plaintiffs) as services provided to the Plan by TIAA.

---

[9] Plaintiffs incorporate by reference and rely upon the Plan's Form 5500 filings in the Amended Complaint. Am. Compl. ¶¶ 6-10.

[10] These codes include: (Code 15) Recordkeeping and information management (computing, tabulating, data processing, etc.); (Code 17) Consulting (pension); (Code 27) Investment advisory (plan); (Code 28) Investment management; (Code 38) Participant communication; (Code 50) Direct payment from the plan; (Code 52) Investment management fees paid indirectly by plan; (Code 54) Sales loads (front end and deferred); (Code 64) Recordkeeping fees; and (Code 66) Insurance mortality and expense charge.

Thus, on the face of the Amended Complaint, Plaintiffs have not, and cannot, plausibly argue that the Plan's fees for "recordkeeping and administrative" services were excessive when their own calculations of the Plan's alleged fees plainly include amounts for other services. Further, as described above, Plaintiffs also concede that their calculated per-participant "fees" do not consider any "indirect compensation" paid by the Plan or any of the comparator plans. Am. Compl. ¶ 68 ("Yes-$0").

Thus, on the face of the Amended Complaint, the decreasing $49.24 to $30.94 per-participant fee that the Plan supposedly paid TIAA from 2019 to 2023 does not reflect the fees attributable only to TIAA's essential recordkeeping and administrative services to Plan, nor does it plausibly establish that the fees paid by the Plan were excessive relative to the services rendered. Plaintiffs cannot point to *any injury* from such wholly flawed and nonsensical allegations.

## II. Plaintiffs Fail to Plausibly Allege a Prohibited Transaction Under Rule 12(b)(6).

### A. Plaintiffs' Conclusory Allegations Are Insufficient to State a Claim.

In *Iqbal*, the Supreme Court emphasized that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." 556 U.S. at 678. Allegations that are also "merely consistent with" a prohibited transaction without sufficient "factual enhancement" do not cross "the line between possibility and plausibility." *Id.*; *Twombly*, 550 U.S. at 557. *Cunningham* did not alter these well-settled pleading obligations.

As discussed above, the Amended Complaint is premised on the meritless allegations Plaintiffs relied upon to support their now-abandoned fiduciary breach claims. As such, Plaintiffs do not proffer the factual support necessary to plausibly allege the elements of a prohibited transaction, whether under ERISA Section 406(a)(1)(C) or (a)(1)(D). Rather, Plaintiffs conflate the two prohibited transaction provisions by alleging, in conclusory fashion, that Defendants

violated both provisions by engaging and paying TIAA to provide essential and necessary recordkeeping services to the Plan.[11] Such "labels and conclusions" and "naked assertions" are insufficient to survive a motion to dismiss, *Iqbal*, 556 U.S. at 678, as another district court correctly concluded just last week. *See* **Ex. C**, Opinion & Order, *Fleming v. Kellogg Co.*, No. 1:22-cv-0593, (W.D. Mich., Dec. 8, 2025) Dkt. No. 87 at PageID.1821-24 (granting motion to dismiss prohibited transaction claim premised on allegedly excessive recordkeeping fees for failure to state a claim).

### B. Plaintiffs' Establish The ERISA Section 408(b)(2) Exemption On The Face Of The Amended Complaint.

Plaintiffs' prohibited transaction claim should also be dismissed because the Amended Complaint directly implicates and establishes the prohibited transaction exemption in ERISA Section 408(b)(2). That Section expressly permits plans to engage in the transactions covered by Section 406(a)(1) where the services are "necessary for plan operation and the fees are reasonable." 29 U.S.C. § 1108(b)(2).

While *Cunningham* clarified that ERISA plaintiffs do not need to affirmatively address every potentially applicable exemption when pleading a prohibited transaction, 604 U.S. at 702, the Court's decision did not impact the long-settled legal principle that affirmative defenses, including exemptions, may be raised on a motion to dismiss "if the defense appears on the face of the complaint." *Aetna Life Ins. Co. v. Fast Lab Techs., LLC*, 2025 WL 2463706, at *7 (S.D.N.Y. Aug. 27, 2025) (under Second Circuit law, the dismissal of an ERISA claim at the motion to dismiss stage is appropriate when "(1) the affirmative defense appears on the face of the complaint . . ." and dismissing the claim on exhaustion grounds); *see also, e.g.*, *Hill v. Delaware N. Cos.*

---

[11] Courts correctly recognize the different requirements for establishing a prohibited transaction under (a)(1)(C) and (a)(1)(D). *See Reich v. Compton*, 57 F.3d 270, 279 (3d Cir. 1995); *Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 541 F. Supp. 3d 496, 515 (D.N.J. 2021); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 421 (S.D.N.Y. 2010).

*Sportservice, Inc.*, 2012 WL 2405233, at *2 (W.D.N.Y. June 25, 2012) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint."); *Markel Am. Ins. Co. v. Mr. Demolition, Inc.*, 717 F. Supp. 3d 238, 244 (E.D.N.Y. 2024) (same); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) (same) (citing cases); *accord Rose v. Guardian Life Ins. Co. of Am.*, 2025 WL 2972236, at *2 (D.S.C. Oct. 21, 2025) (quoting *Busha v. S.C. Dep't of Mental Health*, 2019 WL 653969, at *2 (D.S.C. Jan. 28, 2019), *report adopted sub nom.* 2019 WL 651680 (D.S.C. Feb. 13, 2019)) (explaining in ERISA case that "where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6))").

Plaintiffs' prohibited transaction claim, which is premised on "Defendants' [alleged] decision to agree to pay excessive fees to TIAA as recordkeeper for the Plan," Am. Compl. ¶ 79, clearly implicates the Section 408(b)(2) exemption such that it "appears on the face of the complaint." *E.g.*, *Aetna Life Ins. Co.*, 2025 WL 2463706, at *7; *Hill*, 2012 WL 2405233, at *2. As described above, Plaintiffs admit TIAA's recordkeeping services to the Plan "were essential," Am. Compl. ¶¶ 57-59, which addresses Section 408(b)(2)'s requirement that the services be necessary for plan operation. And by alleging Defendants' "agree[ment] to pay excessive fees to TIAA as recordkeeper" "amounted to" a prohibited transaction under Section 406(a)(1)(C) and (a)(1)(D))," Am. Compl. ¶ 79, Plaintiffs implicate Section 408(b)(2)'s reasonable compensation requirement, *see id.* ¶¶ 65-66 (using the terms "excessive," "unreasonable," and "above-market" fees interchangeably). Accordingly, under Second Circuit law, this Court may apply the Section 408(b)(2) exemption to dismiss Plaintiffs' prohibited transaction claim.

In addition to Plaintiffs' allegations regarding the Plan's (and their comparator plans') fees being fatally flawed (*see supra* at I.C.), those allegations plainly demonstrate that the fees the Plan allegedly paid to TIAA were reasonable. Plaintiffs allege that their self-selected comparator plans—which vary from year to year—paid a wide range of per-participant fees for a wide range of recordkeeping, administrative, and other services from different recordkeepers: supposedly between $9 and $28 per-participant. Am. Compl. ¶ 68. Based on that range—which does not include or consider the additional indirect compensation paid by each of the comparator plans—the alleged per-participant fees the Plan paid to TIAA for its essential recordkeeping, administrative, and other services (which notably decreased to $30.94 during the time period for a wider range of services than the bulk of the comparator plans received), *id.* ¶ 67, plainly satisfy ERISA Section 408(b)(2)'s "reasonable compensation" requirement.

## III. The University of Rochester, the Board of Trustees, and the Unnamed Board Members Are Not Proper Defendants.

Finally, Plaintiffs improperly assert their prohibited transaction claim against "All Defendants," including the University of Rochester, its Board of Trustees, the individual unnamed Board members (referred to as "John Does"), and the Committee. Am. Compl. at 21. Plaintiffs, however, concede that the University of Rochester's role was limited to "appoint[ing] the Committee … to administer the Plan," *id.* ¶ 26, and that it did so "acting through its Board of Trustees," *id.* ¶ 29. Plaintiffs further concede that "[t]he Committee has the authority to employ … recordkeepers … and other service providers as it finds necessary or appropriate to assist in it carrying out its duties" to the Plan. *Id.* ¶ 33. While fatally flawed for the reasons above, Plaintiffs' prohibited transaction claim challenges the decision to engage TIAA to provide essential and necessary recordkeeping services to Plan, which is plainly, and solely, within the scope of the

Committee's authority. Accordingly, the University of Rochester, the Board of Trustees, and the unnamed Board Members are not proper defendants and should be dismissed.

## CONCLUSION

Plaintiffs' Amended Complaint is a thinly veiled attempt to assert a baseless challenge to the Plan's recordkeeping fees under the guise of a prohibited transaction in an effort to survive a motion to dismiss. The Court should reject this clear act of gamesmanship because Plaintiffs lack Article III standing and they otherwise fail to plausibly allege any prohibited transaction claim. For the reasons set forth above, the Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

Dated: December 15, 2025

**MAYER BROWN LLP**

/s/ *Nancy G. Ross*
Nancy G. Ross
Richard E. Nowak (*pro hac vice pending*)
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, IL 60606
Phone: (312) 782-0600
Email: nross@mayerbrown.com
rnowak@mayerbrown.com

E. Brantley Webb (*pro hac vice)*
Jennifer L. Weinberg *(pro hac vice)*
MAYER BROWN LLP
1999 K St. NW
Washington, DC 20006
Phone: (202).263-3000
Email: bwebb@mayerbrown.com
jlweinberg@mayerbrown.com

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing Notice of Motion to Dismiss Pursuant to Rule 12(b)(1) and 12(b)(6) Plaintiffs' Amended Complaint and Memorandum In Support of Motion to Dismiss Pursuant to Rule 12(b)(1) and 12(b)(6) Plaintiffs' Amended Complaint was served on Plaintiffs' counsel of record via the Court's ECF system on December 15, 2025.

Dated: December 15, 2025

*/s/ Nancy G. Ross*
Nancy G. Ross